[Civ. Nos. 2584, 2585.   Third Appellate District.—February 21, 1924.]

## CHARLES F. HUNCEKER, Respondent, v. LUELLAH C. LUTZ et al., Appellants.

[1] WATERS AND WATER RIGHTS—EXTENT OF USE—DEFECTIVE PLEAD-
ING—ERROR CURED BY ANSWERS.—In an action involving the
validity, priority, and extent of water rights claimed by the re-
spective parties in the waters of a certain natural stream, an
allegation that "the waters heretofore diverted by plaintiff . . .
would not exceed one hundred twenty (120) inches of water mea-
sured under a four (4) inch pressure" is open to the objection
that it cannot be ascertained therefrom what quantity of water
plaintiff used, and where such defect is not cured by any allega-
tion elsewhere in the complaint, defendants' demurrers thereto on
that ground should be sustained; but where such demurrers are
overruled and the defendants' answers, in addition to denying the
allegations of the complaint, affirmatively plead the right and title
of defendants to the waters of said stream and defendants then
pray judgment confirming their title as thus set forth, the error of
the trial court in overruling their demurrers becomes immaterial.

[2] ID.—JUDGMENTS—TIME—RES JUDICATA.—A judgment determining
the right and title of certain persons to the waters of a given
natural stream, upon becoming final, is *res judicata,* from the date
of its entry, as to the rights of said persons and their successors
in interest to the waters of said stream, except in so far as new
rights are thereafter acquired.

[3] ID.—PRESCRIPTIVE RIGHTS — PERMISSIVE USE — WASTE WATERS.—
No prescriptive right can be based upon a permissive use or upon
what is generally known and called waste waters.

[4] ID.—ADVERSE USE—STATUTORY PERIOD — FINDINGS — EVIDENCE.—
In this action involving the validity, priority and extent of water
rights claimed by the respective parties in the waters of a certain
natural stream, although the evidence showed that more than five
years had elapsed between the time when plaintiff began to con-
struct his ditch and the commencement of the action, wherein he
claimed title by prescription, the evidence having also shown that
the rights of defendants were established prior to the time when
plaintiff undertook to make an appropriation and that less than
five years having elapsed between the actual diversion and use of
water by plaintiff and the commencement of the action, the trial
court's finding of five years' adverse possession by plaintiff was
unsupported.

[5] ID.—RIPARIAN RIGHTS — ADVERSE USER—TIME. — Riparian rights cannot be divested by an adverse user unless such adverse user has continued for the full period of five years under such circumstances as the law requires to establish title in that manner.

APPEAL from a judgment of the Superior Court of Shasta County. J. E. Barber, Judge. Reversed.

The facts are stated in the opinion of the court.

Carr & Kennedy and Chenoweth & Leininger for Appellants.

Jesse W. Carter, John H. Tolan and Carter & Smith for Respondent.

PLUMMER, J.—The two actions, numbered as stated above, were consolidated for the purposes of trial and were presented to this court upon one transcript, heard as one cause, and will be so considered in this opinion. The action involves the validity, priority, and extent of water rights claimed by the respective parties in the waters of Rock Creek, a natural stream situated in the county of Shasta.

The action was brought by the plaintiff to quiet title to 120 inches measured under a four-inch pressure of the waters running and being in said Rock Creek. His claim or title thereto is based upon prescription or adverse use. The respondent's land consists of forty acres situated in the vicinity of said Rock Creek and susceptible of irrigation therefrom.

Prior to the commencement of this action and on or about the nineteenth day of June, 1908, a judgment was made and entered in the Superior Court of Shasta County adjudging and decreeing that the grantors and predecessors in interest of the appellants herein were the owners of and entitled to take and receive from said Rock Creek, through a certain ditch known as and called the Stone ditch, 500 miner's inches of water prior to any right, title, or interest of the plaintiff in this action to any of the waters of said Rock Creek and also enjoining and restraining the plaintiff from taking any waters from the said Rock Creek until after the grantors and predecessors in interest of the appellants herein had first had and received such 500 miner's

inches of water from said stream. It further appears that after the entry of this judgment the plaintiff in this action caught up and used upon his premises certain waste waters from a sawmill on Rock Creek situated thereon above the take-out of any of the ditches involved in this action and continued to reclaim and use such waste waters with the permission of the owners and operators of said mill until it was closed down in the fall of 1913; that the water so caught up and reclaimed by the plaintiff was taken up at a point called the sawdust pile and conducted through a certain ravine called Swamp Ravine down to the forty acres of land owned by him and there used for irrigation and domestic purposes. It also appears that the water used in the operation of said mill was obtained by an arrangement with the plaintiffs in the action referred to in which judgment was entered on or about June 19, 1908, said plaintiffs being the predecessors and grantors in interest of the appellants herein.

The supply of water thus caught up by the plaintiff being shut off in the fall of 1913, a ditch of about thirty rods in length was constructed by him in the month of January, 1914, and on or about the eleventh day of March, 1914, the plaintiff herein filed a notice appropriating 120 inches of the waters flowing in Rock Creek at a point on said stream below the mill herein referred to and in that year began the diversion of water directly from the stream. On or about the fifth day of October, 1918, upon proceedings instituted therefor and based upon the judgment hereinbefore referred to, the plaintiff was cited to show cause why he should not be punished for contempt for violation of said judgment during the seasons of 1917 and 1918, and after various hearings upon said order to show cause, the plaintiff in this action was on the nineteenth day of February, 1919, adjudged to be in contempt of the superior court of Shasta County by reason of his violations of the judgment and decree entered against him and in favor of the grantors and predecessors in interest in 1908, as hereinbefore stated. After the institution of the proceedings herein referred to and before judgment was entered therein, the plaintiff on the thirteenth day of February, 1919, began the actions now before this court.

The trial court awarded the plaintiff the relief prayed for, to wit, a prior claim of 120 miner's inches of the waters of said Rock Creek.

The appellants now assign ten separate reasons why the judgment of the lower court should be reversed, the first, second, third, and fourth of which are in substance to the effect that the decision of the trial court that the plaintiff is the owner of and entitled to the use of 120 inches of water measured under a four-inch pressure prior to any of the rights of the appellants herein, and that said title was acquired by prescription and adverse use, is not supported by the evidence. Objections are also urged to the ruling of the court in relation to the admission of testimony; also that there is no evidence to justify the award of the continuous flow of the waters awarded to the plaintiff. [1] One of the grounds assigned as the reason for an appeal herein is that the court erred in overruling appellants' demurrer to the plaintiff's amended complaint. This objection, at the time it was passed upon, would seem well taken. The seventh paragraph of the plaintiff's complaint, in which he attempts to set forth his title to the waters of Rock Creek, is in the following language: "That the water heretofore diverted by plaintiff from said Rock Creek by and through said ditch on to the lands and premises of plaintiff, as aforesaid, would not exceed one hundred twenty (120) inches of water measured under a four (4) inch pressure, and that said plaintiff is the owner of and entitled to the possession, and claims the right to divert through said ditch and to use upon said land for stock and domestic purposes and for the purposes of irrigation, as aforesaid, one hundred twenty (120) inches of water measured under a four (4) inch pressure."

The defendants demurred specifically to the plaintiff's complaint and urged that the paragraph herein referred to does not state a cause of action in that it cannot be ascertained therefrom what quantity of water the plaintiff used. It is apparent from a reading of the paragraph that this contention is well founded. This defect in the complaint is not cured by any allegations elsewhere contained therein. The defendants, however, after the overruling of their demurrers, proceeded to file answers, not simply denying the allegation of the plaintiff's complaint, but, proceeding to

set up affirmative defenses, to wit, their right and title to the water of Rock Creek, the land owned by them, the uses of the waters of Rock Creek made by them, and the manner in which they severally obtained title to the waters of said stream, and then prayed judgment of the trial court confirming their title as set forth in their affirmative defenses as against the plaintiff in this action, thus tendering issues for the trial court to hear and determine. Under such circumstances and in this state of the pleadings the error of the court in overruling the appellants' demurrers became immaterial.

If the plaintiff in this action has any prior right to the waters of Rock Creek, it must be based upon some title acquired after the entry of judgment on June 19, 1908, in which it was adjudged and decreed that the grantors and predecessors in interest of the defendants in this action were the owners of 500 inches of the waters of said stream and were entitled to take therefrom that quantity of water prior to the taking of any water from said stream by the plaintiff herein. The cause was tried before the court sitting with a jury. Special issues were submitted to the jury, the court adopted the same but subsequently made its own findings in which it disregarded, in some particulars, the answers given by the jury to the special issues submitted for their consideration. Under the law the court had a right to adopt the findings of the jury or to disregard them and make its own findings. No point is made for reversal by reason of the action of the trial court in disregarding the answers given by the jury to some of the special issues submitted to them, but they are called to the attention of this court for the purpose of showing some contradictory matters which we deem, however, unimportant and not necessary to be considered. Disregarding the minor objections urged by appellants, the crucial question on this appeal is whether the following findings made by the trial court are supported by the evidence, to wit: "That for more than five years last prior to the commencement of this action, said plaintiff has diverted from said stream of Rock Creek in and through said Hunceker Ditch, mentioned in plaintiff's first amended complaint, 120 inches of water of the natural flow of said stream, measured under a 4-inch pressure, at the head of said Hunceker ditch and has conveyed

the same through said Hunceker ditch, to, over and upon
the lands of plaintiff hereinabove described, and there used
the same for beneficial uses and purposes, to wit: irrigation
of crops growing upon said land, the watering of stock and
domestic purposes, and that during all of said time said
diversion and use was and has been continuous, and open,
and notorious and uninterrupted, and under claim of right
and in every way adverse to defendants, and each of them,
and to their grantors and predecessors in interest. . . . ''
And the further finding: ''That the above-named defend-
ants, and each of them, claim an interest in the waters of
said stream of Rock Creek flowing at the head of said ditch,
adverse to said plaintiff herein, as hereinabove found, and
that said claim of said defendants, and each of them, is
wrongful, unlawful and without right.''

[2] It is not questioned and it cannot be seriously ques-
tioned that the judgment of the trial court entered in June,
1908, is final and conclusive and at that particular time
established the prior rights in interest of the appellants
herein to the waters of said Rock Creek as against the
claims of the plaintiff, Charles F. Hunceker, in this action.
That judgment not only confirms the rights in and to the
waters of said Rock Creek to the predecessors and grantors
of the appellants herein but further adjudges that the de-
fendant in said action, Charles F. Hunceker, does not own
any of the waters of Rock Creek and has no rights therein.
It is unnecessary to cite authorities showing that this judg-
ment, at the date of its entry, was *res judicata* as to the
rights of the parties to the waters of said Rock Creek. Has·
the plaintiff acquired any title thereto as against the defend-
ants in this action by adverse use of the waters of said
stream for the statutory period of five years since 1908 and
prior to February 13, 1919, the date of the commencement
of this action? The testimony is practically undisputed
that the use of the water by the plaintiff after June 19,
1908, down to the date of the closing of the mill, herein
referred to, was simply permissive and that no adverse use
was made of said waters by the plaintiff until on or about
March 11, 1914. The mill referred to appears to have been
under the management of one C. R. Forward and is known
as the Forward mill. His testimony as to the manner in
which he obtained the right to use said waters, as set out in

the transcript, is as follows: ''Q. Prior to using this water for the purpose of carrying off sawdust and other waste materials at your mill, did you make any arrangements with any person for the use of that water? A. Yes, sir. Q. And with whom? A. With Ed Head. Q. And when you say Ed Head, do you refer to A. W. Head? A. Yes, sir. Q. Do you recall of an action brought in the Superior Court of this county by the following named plaintiffs: A. E. Head, V. B. Taylor and Mrs. E. R. Stone, as plaintiffs, against Charles Hunceker as defendant and who is plaintiff in this action? A. Yes, sir. Q. Were you a witness in that suit? A. No, sir. Q. But you know about the suit? A. Yes, I have heard of it. Q. And I will ask you whether or not the A. E. Head with whom you made the arrangements for the use of water out of Rock Creek for carrying sawdust and other waste materials from your mill, is the same A. E. Head who was plaintiff in the action which I have just referred to? A. Yes, sir, he was. Q. Now, will you please state, Mr. Forward, what arrangements you made with Mr. Head for the use of water from Rock Creek for carrying off sawdust and other materials from your mill? A. Well, I spoke to Mr. Head about the water and he said yes, I might have the water, but that he wanted me to pay him something to protect his rights in the creek in case somebody else would claim it after it had gone to waste, knowing it would run away from the slope of Rock Creek. Q. When you were not using the water to conduct sawdust and other refuse from the mill, what was done with the water? A. Well, as a general rule, it was turned back into the creek. Q. And state whether or not you had any arrangements with Mr. Head in reference to that feature of the use of the water? A. Yes, he asked me when I was not using it to turn it back into the creek, at nights and Sundays, and so forth. Q. And was that agreed and arranged with Mr. Head at the time you went to him about using water from Rock Creek? A. Yes, sir. Q. And at night time what did you do with the water? A. Well, I turned it back into the creek as a general rule. Q. And what did you do on Sundays? A. We turned it into the creek. Q. And by what means did you turn the water into the creek? A. Well, we had a slip gate in the side of the flume above the mill and we just pulled it out and it was long enough so the water couldn't none

pass by, all dropped out through the opening when we lifted the board out. Q. Did you in any way compensate Mr. Head for the use of the water? A. Yes, sir. Q. And in what manner? A. Why, I gave him lumber for the use of it. Q. And over what period of time did you give him lumber? A. Through the entire time that I operated. Q. When did you cease the use of this water from Rock Creek for carrying off refuse from the mill? A. Well, I think some time during the month of September in 1913. Q. And when you ceased operating your mill, what did you do with the water? A. Turned it into the creek.''

This witness further testified that the mill was closed in September, 1913, but that he allowed the water theretofore used by him in connection with the operation of said mill to continue running for a period of about two weeks longer at the request of the plaintiff in this action, the testimony being as follows: ''Q. When did you cease the use of this water from Rock Creek for carrying off refuse from the mill? A. Well, I think sometime during the month of September in 1913. Q. And when you ceased operating your mill, what did you do with the water? A. Turned it into the creek. Q. And did you immediately turn the water into the creek after you had ceased operating your sawmill? A. No, I let it run for a while. Q. How long did you let it run? A. Perhaps for a week or two. Q. Why did you do that? A. Well, I did it for Mr. Hunceker. Q. And just state what the circumstances were that caused you to do this for Mr. Hunceker, the plaintiff in this action? A. Well, he needed the water for his garden and stuff and I wanted him to have it and I thought perhaps the other people could get along without it, and he had asked me to turn it down to him and I did so. Q. When did he ask you to permit the water to run down to him? A. Well, that was probably a couple of weeks before I—well, very often, as far as that was concerned on Sundays and such times, he would say he was going home, he would work for me, he would like for me to leave the water run on the Sunday and I did that a great many times. Q. And at whose request? A. His. Q. When you say his, you mean the plaintiff in this action, Mr. Hunceker? A. Yes, sir. Q. And when was it that he requested you to permit the water to run after you had ceased the operation of your sawmill in 1913?

A. Well, it was just about a couple of weeks, I suppose, before I finally did shut it off.''

Upon this same question the plaintiff testified as follows: ''Q. While you were up taking water from the sawdust pile after Ross Forward used it in his mill at that time, in those years from 1908 to 1914, you weren't claiming the right to take that water adversely to the people down the creek, who had previously sued you, were you? A. When she dumped over the hill, I had a right to it because it was considered waste water. Q. It was considered waste water? A. Waste water. Q. And you claimed you were taking waste water? A. That is what I was taking that water there—that way. Q. You also claimed in those years that the taking of that water through the mill didn't invade the rights of the parties who had sued for that injunction against you? A. Well, they didn't object. Q. You claimed that you didn't invade their rights, didn't you? A. No. Mr. Kennedy: Q. Now, Mr. Hunceker, it was after that injunction was issued against you by this superior court, that you went up to Forward's mill to get water, wasn't it? A. I did. Q. And because of that injunction, wasn't it? A. Yes, sir. Q. Subsequent to the entry of that judgment, Mr. Hunceker, which you remember, and when you went to take Mr. Forward's waste water from his sawdust pile, you considered that you were not adversely taking away from these defendants who had an injunction against you, any water that belonged to them, didn't you? A. Oh, I didn't consider I was hurting anybody. Mr. Kennedy: Q. You didn't consider you were taking their water, is that it? A. No, sir, I was not taking their water at all. Q. You didn't consider then that you were invading their right to any water, did you? A. I did. Q. You did consider you were or you weren't? A. I didn't consider that I was invading their rights at all. Q. And you didn't claim to be? A. I didn't claim to invade their rights. Q. At all times after that when you took water either from Forward's mill or directly from Rock Creek, you didn't consider you were invading their rights established by that decree? A. I didn't think I was interfering with their rights at all. . . . Q. And for the year 1913 where did you get your water? A. Same source. Q. That is, from the flume? A. From the mill. Q. And how long was water diverted through that flume? A. Till about

65 Cal. App.—42

the—till the rainy season, about the first of October.
Q. Now, Mr. Hunceker, when did the mill close down?
A. Some time in the first of October.    Q. October?    A. Yes,
the rainy season.    Q. What was done with the water that
continued to run in the flume?    A. Well, I don't know, I
wasn't there.    Because we was getting water from other
sources, from the hills then, the hills was saturated with
rain.''

There is no question and there can be no question but that
during all the period now being considered the plaintiff was
using waste or abandoned water coming from the Forward
mill and gathered up by him at the point known as the saw-
dust pile.    Upon this it was first sought to base the plaintiff's
claim to said waters.    This claim, however, was abandoned
during the course of the trial.    [3]    The authorities are
without conflict that no prescriptive right can be based
upon a permissive use or upon what is generally known
and called waste waters.    (*Davis* v. *Martin,* 157 Cal. 657
[108 Pac. 866]; *Dannenbrink* v. *Burger,* 23 Cal. App. 587,
596 [38 Pac. 751]; Kinney on Water Rights, 2d ed., sec. 661;
Wiel on Water Rights, sec. 57.)

The undisputed testimony hereinbefore set forth shows
conclusively that the plaintiff's right, if any, begins at a
date subsequent to the year 1913.    The testimony also shows
that the use of the water by the Forward mill was a per-
missive use and for which compensation was agreed to be
made and was not a nonuser or abandonment of the water so
as to forfeit title thereto by the owners of the same.

[4]    Has the plaintiff acquired any adverse rights to the
use of said waters since the year 1913?    The testimony is
undisputed that the thirty-rod ditch constructed by the plain-
tiff was built during the month of January, 1914, and that
on the eleventh day of March he filed a notice of appropria-
tion of 120 inches of the waters of Rock Creek and on that
day began diverting through said ditch the waters claimed
by him.    The notice is as follows: ''Notice is hereby given
that I claim the flowing waters of Rock Creek to the extent
of 120 inches, measured under a four-inch pressure; that
the purpose for which I claim the said waters is for stock
water, domestic purposes and irrigation (a description of
the 40 acres of land owned by the plaintiff is herein set
forth.)    The point of intended diversion is on the south

bank of said Rock Creek at a point near the east line of the Southeast quarter of Section 17, Township 30 North, Range 2 East, M. D. M. . . . Dated this, the 11th day of March, 1914.''

This notice was thereafter recorded in the office of the county recorder of Shasta County. Upon this basis the respondent makes the following claims: "This action was commenced by filing of the complaint on February 13, 1919, more than five full years after respondent had commenced the construction of his ditch out of Rock Creek, where he made his present diversion. It is our contention, therefore, that the respondent's right was initiated at the time he commenced the construction of his ditch and that the five year period would start to run from the time he openly and notoriously entered upon the creek and performed acts which unequivocally showed his intention of diverting the water from Rock Creek, and his subsequent diversion and use of the water continuously and without interruption, would, after the expiration of five years, ripen into a prescriptive right to the use of the water."

To sustain this contention the respondent relies upon the case of *Haight* v. *Costanich*, 184 Cal. 426 [194 Pac. 26]. We will quote therefrom as follows: ''However, the quantity of water to which a person may become entitled by diversion is not necessarily limited to the amount of water actually used at the time of the original diversion. Inasmuch as plaintiff's diversion was not made under the modes prescribed by the California statutes, it is governed solely by the California law of possessory rights, as it existed prior to the adoption of such statutory methods. The cases involving water rights acquired under this law 'lay down the rule that a right to the use of running water does not vest in possession at common law, until there has been an actual diversion and beneficial use of the water. But they all recognize, and some of them declare, that, before any actual diversion or use of the water, a claimant may acquire an incipient, incomplete, and conditional right to the future use of the water, by beginning the construction of the works necessary for such diversion and use, and, in good faith, diligently prosecuting the same toward completion. . . . There is no case, arising prior to the enactment of the code, which holds that the party who thus in good faith began

and diligently prosecuted the work on a dam and ditch for the diversion and use of water, could not protect his incipient right to the water against the hostile diversion and claims of others by an appropriate suit for that purpose. Such visible act and avowed intent gave him a conditional right to the future use of the water, prior to its actual use, the condition being that he should thereafter diligently continue the work to completion and then divert the water and apply it to a useful purpose, failing which his right would cease. Upon the performance of these conditions his title to such use would become complete and perfect. In the meantime, however, he had an existing conditional right, manifested by actual visible possession of the works.' "

The facts of that case, however, are so dissimilar from the one at bar that a short analysis suffices to show the inapplicability of that case to the one now being considered. In the case of *Haight* v. *Costanich, supra,* the court was considering the right of an appropriator to refer an increase of irrigation back to the construction of his works, as against the intervening riparian owner. In the case at bar the rights of appellants were established prior to the time when plaintiff undertook to make an appropriation of the waters of Rock Creek and thus could be divested only by an actual diversion and use of the waters of said stream in the manner and for the time required by the statute of limitations. The appellants' rights were not invaded until the actual diversion and use of the waters by the plaintiff herein. The question before the court is one of adverse use and has nothing to do with the doctrine of relation. As stated by appellants: "Until the water was diverted into plaintiff's ditch the defendants had no cause of action against him; he did not commence such diversion until March 11, 1914, and until March 11, 1919. plaintiffs could bring an action for the trespass and toll the statute of limitations. Before this time expired respondent filed the present action, and he cannot now bolster up an insufficient claim of adverse use by the doctrine of relation."

[5] We do not deem it necessary to discuss the riparian rights of the appellant, Northern California Power Company, Cons., further than to refer to the cases of *Lux* v. *Haggin*, 69 Cal. 255 [4 Pac. 919, 10 Pac. 674], *Gallatin* v. *Corning Irr. Co.*, 163 Cal. 405 [Ann. Cas. 1914A, 74, 126 Pac. 864],

which set forth fully the law relating to riparian rights and from which it follows that those rights cannot be divested by an adverse user unless such adverse use has continued for the full period of five years under such circumstances as the law requires to establish title in that manner. The appellants also contend that there is no testimony to support the findings as to the right of the plaintiff to a continuous use of the waters of Rock Creek and that there is no showing as to the period of time during the each twenty-four hours the plaintiff made use of the waters claimed by him, but from what has been heretofore said these questions become immaterial, because if the plaintiff has not established title by five years' adverse use of the waters involved, then and in that case all such questions become of no importance. From what has been said in this opinion it is evident that there is no testimony supporting the finding of the trial court of five years' adverse use by the plaintiff to the waters of Rock Creek as claimed by him and that the court was in error in applying the doctrine of relation in this case and in counting a period of time anterior to the actual diversion of the water by the plaintiff in order to make up such five years.

This necessitates the reversal of the judgments herein, and it is so ordered.

Finch, P. J., and Shields, J., *pro tem.*, concurred.